# United States Court of Appeals for the Federal Circuit

---

**INSERSO CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**FEDITC, LLC, RIVERSIDE ENGINEERING, LLC,**
*Defendants*

---

2019-1933

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01655-LAS, Senior Judge Loren A. Smith.

---

Decided: June 15, 2020

---

RICHARD P. RECTOR, DLA Piper LLP (US), Washington, DC, for plaintiff-appellant. Also represented by DAWN STERN; CARL BRADFORD JORGENSEN, Austin, TX.

ANTHONY F. SCHIAVETTI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE.

---

Before REYNA, MAYER, and TARANTO, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TARANTO.

Dissenting opinion filed by *Circuit Judge* REYNA.

TARANTO, *Circuit Judge*.

The United States Defense Information Systems Agency (DISA), which is part of the U.S. Department of Defense, awarded contracts to multiple firms that bid for the opportunity to sell information technology services to various federal government agencies. Inserso Corporation unsuccessfully competed to be one of the firms awarded a contract. In an action filed against the United States in the Court of Federal Claims, Inserso alleged that DISA disclosed information to certain other bidders but not Inserso, giving the rival bidders an unfair competitive advantage. The Court of Federal Claims held that DISA's disclosure did not prejudice Inserso in the competition and on that basis entered judgment in favor of the government. *Inserso Corp. v. United States*, 142 Fed. Cl. 678 (2019).

We agree that judgment in favor of the government is appropriate, but on a different ground. We conclude that, because Inserso did not object to the solicitation when it was unreasonable to disregard the high likelihood of the disclosure at issue, Inserso forfeited its ability to challenge the solicitation in the Court of Federal Claims. We do not reach the prejudice portion of the court's decision. We therefore vacate that decision and remand for the court to enter judgment consistent with this opinion.

I

On March 2, 2016, DISA publicly posted Solicitation No. HC1028-15-R-0030 (Encore III). The solicitation invited firms to bid for the opportunity to enter into indefinite-delivery/indefinite-quantity contracts under which the awardees would provide information-technology services to

the Department of Defense and other federal agencies. The solicitation states that the contracts would involve fixed-price and cost-reimbursement task orders and that awards of contracts would be made to offerors whose proposals provided the best value to the government and satisfied the evaluation criteria.

The solicitation lists three criteria for evaluating proposals: (1) the bidder's technical/management approach, (2) the bidder's past performance, and (3) cost/price information. For the evaluation of price, the solicitation states, DISA would calculate a "total proposed price" and a "total evaluated price." J.A. 101918. The total proposed price would be calculated by applying government-estimated labor hours for each year of contract performance to each offeror's proposed fixed-price and cost-reimbursement labor rates; in turn, the total evaluated price would be calculated by adjusting any cost-reimbursement rates that DISA determined were unrealistic. The proposals with the lowest total evaluated price would then be evaluated for compliance with the other terms of the solicitation.

DISA divided the Encore III competition into two competitions. One competition would award a "suite" of contracts in a "full and open" competition; the other would award a suite of contracts to small businesses. J.A. 101891. DISA anticipated awarding up to twenty contracts in each competition.

Importantly, the solicitation expressly states that small businesses could compete in both competitions but could receive only one award. J.A. 101892. The solicitation also provides that firms could compete through joint ventures or partnerships. J.A. 101907. Under those provisions, several firms that bid in the small-business competition in fact also competed in the full-and-open competition as part of joint ventures. Inserso competed only in the small-business competition.

Bidders in both competitions submitted their proposals by October 21, 2016. But the timing of the two competitions quickly diverged. On November 2, 2017, DISA notified successful and unsuccessful bidders in the full-and-open competition of their award status. By November 8, 2017, *i.e.*, less than a week later, DISA completed the debriefing process by which it discloses certain details of the agency's selection decision to winners and losers. *See* 48 C.F.R. § 15.506.

DISA had not yet completed evaluating the proposals submitted in the separate small-business competition and was still communicating with bidders in that competition. By October 18, 2017, DISA had received responses to the first round of evaluation notices it had sent to small-business bidders. Even after November 2, 2017, DISA sent several more rounds of evaluation notices to small-business bidders. DISA did not request final proposal revisions from the small-business bidders until April 2018. *See* 48 C.F.R. § 15.307. Ultimately, such bidders had until June 20, 2018, to submit their final revised proposals for the small-business competition.

DISA notified successful and unsuccessful bidders of its award decisions for the small-business suite on September 7, 2018. Inserso did not receive an award because its total evaluated price was the 23rd lowest in a competition for twenty slots. DISA attached a debriefing document to its notice to Inserso. The debriefing included—among other things—the total evaluated price for the twenty awardees and some previously undisclosed information on how DISA had evaluated the cost element of the proposals.

In response to its debriefing, Inserso sent follow-up communications to DISA. Inserso noted that several awardees in the small-business competition had also competed in the full-and-open competition as part of joint ventures or partnerships, and it asked whether those entities had received similarly detailed debriefings at the

conclusion of the full-and-open competition (in fall 2017). Inserso expressed concern that, if so, the earlier debriefing would have provided unequal information giving a competitive advantage to some of the bidders in the pending small-business competition.  In response, DISA stated that all unsuccessful bidders in both competitions were given similarly detailed information in their debriefings.

On September 12, 2018, Inserso filed a protest in the United States Government Accountability Office (GAO). *See* 4 C.F.R. §§ 21.1–21.2.  On October 17, 2018, GAO dismissed Inserso's protest because another party was challenging the same solicitation at the Court of Federal Claims. *See id.*, § 21.11(b).

On October 25, 2018, Inserso filed its own complaint in the Court of Federal Claims, alleging that the full-and-open debriefing gave certain offerors in the small-business competition a competitive advantage by providing them, but not other bidders, the total evaluated price for all full-and-open awardees and previously undisclosed information regarding DISA's evaluation methodology.  Inserso alleged that this unequal provision of information created an organizational conflict of interest in violation of 48 C.F.R. §§ 9.504, 9.505 and, in addition, violated at least one regulation specifically addressed to disparate treatment of bidders, 48 C.F.R. § 1.602-2(b).  Inserso moved for judgment on the administrative record, and the government opposed Inserso's motion and cross-moved for judgment on the administrative record.

The Court of Federal Claims ruled in favor of the government. Without definitively finding a violation, the court recognized that the challenged disclosure of information might have violated the identified regulatory standards, stating in particular that the total evaluated prices of the winners of the full-and-open competition "provided a useful comparison tool that [small-business-competition] offerors could utilize as a benchmark in revising their price

proposals." *Inserso*, 142 Fed. Cl. at 684.  The court also stated that "[p]rejudice is presumed once a potentially significant [organizational conflict of interest] is identified." *Id.*  Here, however, the court concluded, the government demonstrated lack of prejudice to Inserso, a conclusion that defeated Inserso's claim as to both sets of regulations at issue.  *Id.* at 684–85.  The court entered judgment on April 2, 2019.  J.A. 6.

Inserso timely appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

On appeal, Inserso argues that the Court of Federal Claims erred in its treatment of the presumption of prejudice, including in its determination that the government rebutted such a presumption.  Inserso also argues that, even apart from a presumption of prejudice, it was entitled to a finding that it was prejudiced by the challenged unequal disclosure.  The government—in addition to defending the trial court's analysis—argues in this court, as it did in the trial court, that Inserso forfeited its right to challenge DISA's disclosure by not raising the issue in a timely manner.

Under 28 U.S.C. § 1491(b), the Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to" a solicitation or contract award made by a federal agency.  We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error.  *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1335 (Fed. Cir. 2009).  "When making a prejudice analysis in the first instance, [the Court of Federal Claims] is required to make factual findings." *Bannum, Inc. v. United States*, 404 F.3d 1346,1357 (Fed. Cir. 2005).  Whether the court applied the appropriate legal standard to its factual findings is a question of law.  *See Shell Oil Co. v. United States*, 688 F.3d 1376, 1381 (Fed. Cir. 2012).

A

Inserso alleges that DISA violated two sets of regulations that are part of the Federal Acquisition Regulation (FAR). *First*, it alleges that DISA violated FAR subpart 9.5, which directs contracting officers to avoid, neutralize, or mitigate "organizational conflicts of interest." 48 C.F.R. § 9.505. Section 9.505 describes the dual aims of "[p]reventing the existence of conflicting roles that might bias a contractor's judgment" and "[p]reventing unfair competitive advantage." *Id.*, § 9.505(a), (b). An unfair competitive advantage can exist when a contractor possesses "[p]roprietary information that was obtained from a Government official without proper authorization" or "[s]ource selection information (as defined in [48 C.F.R. §] 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." *Id.*, § 9.505(b). *Second*, Inserso alleges that DISA failed to treat it fairly and equally, as required by several provisions of the FAR. *See, e.g., id.*, §§ 1.102(b)(3), 1.602-2(b), 3.101-1.

Both of Inserso's regulatory arguments arise from the same underlying DISA action, having the same alleged wrongful effect on the small-business competition. Specifically, both arguments challenge the disclosure of certain information to firms that (directly or through partnerships or joint ventures) bid for the full-and-open suite of contracts when some of those firms (directly or through partnerships or joint ventures) were still preparing bids for the small-business suite. Because "the scope of work and evaluation factors are nearly identical for each suite," *Inserso*, 142 Fed. Cl. at 684, and the information was relevant to the evaluation of bids, Inserso alleges, DISA's failure to disclose that same information to all bidders in the small-business competition gave those bidders with the information an unfair competitive advantage.

Inserso focuses on two categories of disclosed information: (1) the total evaluated prices of those firms which won contracts in the full-and-open competition; and (2) details of how DISA evaluated the costs built into the proposals made by bidders in that competition. Inserso contends, and the trial court recognized, that knowledge of the winning total evaluated prices from the full-and-open competition would provide a small-business-competition bidder a target range in which it could be confident that it would win an award. Inserso also contends that the cost-evaluation information would have been useful to a small-business-competition bidder who was considering how to reduce the price of its bid in a way that DISA would find acceptable.

Inserso, however, did not object to the disparity in provision of competitively advantageous information until after the awards were made in the small-business competition. We conclude that, by waiting until the awards were made, Inserso forfeited the objection.

B

In *Blue & Gold Fleet, L.P. v. United States*, we held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d 1308, 1313 (Fed. Cir. 2007). We have since held that this reasoning "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). The Court of Federal Claims has correctly applied this rule in organizational-conflict-of-interest cases, including cases dealing with the disclosure of pricing information during debriefing. *See Ceres Envtl. Services, Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011).

A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016). Additionally, a defect is patent if it could have been discovered by reasonable and customary care. *Id.* at 1313; *see also K-Con, Inc. v. Secretary of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice."). "Whether an ambiguity or defect is patent is an issue of law reviewed de novo." *Per Aarsleff*, 829 F.3d at 1312.[1]

---

[1]    The dissent, but not Inserso, suggests that this court's *Blue & Gold* line of authority has been superseded by the Supreme Court's decision in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954 (2017). We do not read *SCA Hygiene* as having the broad implication that the dissent suggests but rather as holding only that the general non-statutory equitable timeliness doctrine of laches does not override the congressionally enacted statute of limitations applicable to legal actions for damages. 137 S. Ct. at 959–67. *Blue & Gold*, in contrast, establishes a "waiver rule" under a specific statutory authorization—the congressional command that bid-protest jurisdiction under 28 U.S.C. § 1491(b) be exercised with "due regard to the . . . need for expeditious resolution of the action," 28 U.S.C. § 1491(b)(3)—with support from longstanding substantive contract law and from regulations under a related statutory regime specific to bid protests. *See Blue & Gold*, 492 F.3d at 1313–14 (discussing "patent ambiguity" and "*contra proferentem*" doctrines and General Accountability Office regulations).

The dissent also suggests that we refrain from ruling on the *Blue & Gold* issue. But Inserso does not dispute that the issue was raised in the trial court, and it is an issue of law that we see no impediment to resolving ourselves.

## C

Those principles defeat Inserso's claims. Inserso should have challenged the solicitation before the competition concluded because it knew, or should have known, that DISA would disclose information to the bidders in the full-and-open competition at the time of, and shortly after, the notification of awards. Inserso knew that the Encore III solicitation process was divided into two competitions and that small businesses could compete for both suites, either individually or as part of a joint venture or partnership. J.A. 101907. It is undisputed that Inserso knew that the full-and-open competition had been completed in November 2017. *See* Appellee Br. 41; *see also* Encore III Full & Open, Sam.gov, https://beta.sam.gov/opp/96e2d2943ebc 322905ebf27cf711e158/view#award (noting that contract award was originally published Nov. 7, 2017).

The FAR indicates that the winning total evaluated prices would have been provided to all unsuccessful offerors in the competitive range within three days of the award. 48 C.F.R. § 15.503(b)(1)(iv) ("Within 3 days after the date of contract award, the contracting officer *shall* provide written notification to each offeror whose proposal was in the competitive range but was not selected for award . . . . The notice *shall* include . . . [t]he items, quantities, and any stated unit prices of each award. If the number of items or other factors makes listing any stated unit prices impracticable at that time, *only the total contract price need be furnished* in the notice.") (emphasis added). And DISA in fact included the awardees' total evaluated prices in its notifications to unsuccessful full-and-open offerors. *See, e.g.*, J.A. 186838–39.

Offerors in a government solicitation are "charged with knowledge of law and fact appropriate to the subject matter." *Per Aarsleff*, 829 F.3d at 1314 (citing *Turner Construction Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004)). Here, that knowledge includes knowing

that the total evaluated prices would be disclosed to bidders in the full-and-open competition at or shortly after the announcement of the awards in that competition. It also includes knowing that the express terms of the solicitation contemplated overlap of bidders in the two competitions (directly or through partnerships or joint ventures), so that Inserso, if it had taken reasonable care, would have known that recipients of the information at issue could include bidders in the small-business competition. The law and facts made patent that the solicitation allowed, and that there was likely to occur, the unequal disclosure regarding prices that Inserso now challenges.

We reach a similar conclusion about the information regarding DISA's evaluation methodology that Inserso alleges would have provided a competitive advantage to bidders in the small-business competition. Although the FAR does not require disclosing such information in the award notice, Inserso should have known that disclosure of this information was likely to be a part of the competitively valuable information required by the FAR to be included in the post-award debriefing. For example, post-award debriefings must include, at a minimum, "[t]he Government's evaluation of the significant weaknesses or deficiencies in the offeror's proposal", "[t]he overall evaluated cost or price . . . , and technical rating, if applicable, of the successful offeror and the debriefed offeror," "[t]he overall ranking of all offerors," and "[a] summary of the rationale for award." 48 C.F.R. § 15.506(d). Although it may have been impossible to know the precise contents of the full-and-open competition's debriefings, Inserso should have known that those debriefings were bound to contain information that would provide a competitive advantage in the small-business competition, including the "overall evaluated cost or price" of the successful offerors. *Id.*, § 15.506(d)(2).

In response to the government's forfeiture argument, Inserso argues that it could not have known that DISA would debrief the bidders in the full-and-open competition

while the small-business offerors were still revising their proposals.  Appellant's Reply Br. 29–30.  Inserso points out that the regulations do not set a strict time limit on debriefing; rather, they require only that "[t]o the maximum extent practicable, the debriefing should occur within 5 days" after an offeror requests debriefing.    48 C.F.R. § 15.506(a)(2).  Therefore, Inserso argues, DISA should not have conducted the debriefing for the full-and-open competition before the small-business competition closed.

We do not think it reasonable for Inserso to have believed that DISA would delay—for three quarters of a year—the post-award debriefing of the bidders in the full-and-open competition.  The debriefing process is an important part of the award process, and the expressly stated baseline rule of five days demonstrates the very short time scale understood to be important.  The "practicable" qualifier gives some flexibility: one treatise notes that when there are many offerors, debriefing may not be completed for *weeks*.  Government Contract Bid Protests: A Practical & Procedural Guide § 2:11.  But no evidence or authority presented to us suggests that the "practicable" qualifier has been used, or could be reasonably counted on by Inserso to be used, to delay debriefing for many months.  Nor could Inserso reasonably rely on DISA to decide to delay the debriefing based on a possibility of unequal advantage in the small-business competition where nobody had called the issue to its attention.  The *Blue & Gold* forfeiture standard exists in recognition of the need for interested bidders to call the agency's attention to solicitation problems of which they reasonably should be aware.

Moreover, Inserso should have known that DISA had debriefed the bidders in the full-and-open competition once the GAO publicly dismissed a post-award protest of the awards in that competition.  GAO's regulations specify that for "a procurement conducted on the basis of competitive proposals under which a debriefing is requested . . . , the initial protest *shall not be filed before the debriefing date*

*offered to the protestor*, but shall be filed not later than 10 days after the date on which the debriefing was held." 4 C.F.R. § 21.2(a)(2) (emphasis added). On February 21, 2018, GAO dismissed a post-award bid protest challenging DISA's awards in the full-and-open competition. *Planned Systems Int'l, Inc.* B-413028.5, 2018 WL 1898124 (Comp. Gen. Feb. 21, 2018). Inserso should have known, from the existence of a relevant protest at GAO, that the bidders in the full-and-open competition had been debriefed. Indeed, the GAO decision states as much. *Id.* at *3. The decision is not subject to a protective order, and there is no indication that it would not have been publicly available on the day it issued. Therefore, Inserso is properly charged with knowing, on or shortly after February 21, 2018, that the bidders in the full-and-open competition had been debriefed.[2]

Because a bidder in the small-business competition exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before the awards were made, Inserso forfeited its right to raise its challenge by waiting until awards were made. Whether starting from the November 2017 award in the full-and-open competition or from the February 2018 GAO denial of a protest in that competition, Inserso had months to notify DISA of this defect before it submitted its final revised proposals. J.A. 178905. It had an additional two

---

[2] The dissent cites a solicitation provision that states: "The estimated labor hours used for evaluation purposes will not be provided to the offerors until after award." J.A. 101918. That provision does not generally negate the expected normal operation of the debriefing process in the full-and-open competition. It applies only to estimated labor hours—thereby highlighting the obviousness of the defect by omitting mention of any other competitively advantageous information.

months before DISA selected the small-business awardees. J.A. 179528. Our previous cases establish that this amount of time is more than sufficient. *See COMINT*, 700 F.3d at 1383 ("Here, Comint had two and a half months between the issuance of Amendment 5 and the award of the contract in which to file its protest. That was more than an adequate opportunity to object.").

D

Enforcing our forfeiture rule implements Congress's directive that courts "shall give due regard to . . . the need for expeditious resolution" of protest claims. 28 U.S.C. § 1491(b)(3). The rule serves the interest in "reducing the need for the inefficient and costly process of agency rebidding after offerors and the agency have expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *Blue & Gold*, 492 F.3d at 1314) (quotation marks and brackets omitted); *see also Per Aarsleff*, 829 F.3d at 1317 (Reyna, J. concurring).

The policy behind the forfeiture rule is served in this case. In its suit in the Court of Federal Claims, Inserso asked the court to provide all bidders in the small-business competition access to the unequally disclosed information and to reopen the competition to accept revised proposals. Had Inserso objected to the solicitation before the submission of final proposals, raising its concern that some bidders might have received information by participating in the full-and-open competition, DISA could have confirmed that an unequal disclosure occurred and provided the nonproprietary debriefing information to all bidders in the small-business competition. *Cf.* 48 C.F.R. § 15.507. Inserso is now seeking the relief it could have gotten from DISA earlier, before DISA had already expended considerable time and effort evaluating the bidders' proposals. Inserso has forfeited its right to this relief.

## III

The Court of Federal Claims entered judgment on the administrative record "pursuant to the court's Opinion and Order, filed April 1, 2019." J.A. 6. Because the cited Opinion and Order relied on the determination that Inserso was not prejudiced by DISA's disclosure—an issue we do not reach—we think it appropriate to vacate the judgment and remand for entry of judgment on the ground of waiver, consistent with this opinion.

The parties shall bear their own costs.

**VACATED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

_____

**INSERSO CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**FEDITC, LLC, RIVERSIDE ENGINEERING, LLC,**
*Defendants*

_____

2019-1933

_____

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01655-LAS, Senior Judge Loren A. Smith.

_____

REYNA, *Circuit Judge,* dissenting.

The majority decides that appellant's claims are barred under the *Blue & Gold* "waiver rule." This decision rests on shaky, legal ground and cannot stand. First, the validity of the *Blue & Gold* "waiver rule" is undermined by the reasoning in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954 (2017). Second, the undermined *Blue & Gold* "waiver rule" does not apply to appellant's claims, which arise from latent errors not apparent from the solicitation. Third, the majority decides to bar appellant's claims under the *Blue & Gold* "waiver rule" in the first instance. We should not

engage in such overreach given that the parties did not brief, and the Claims Court did not discuss, the interplay between *Blue & Gold* and *SCA Hygiene*.  I respectfully dissent.

I

First, the majority's opinion turns on the so-called *Blue & Gold* "waiver rule," a hard-and-fast rule that this court created.  This rule runs afoul of the separation of powers principle articulated in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954, and for this and other reasons should not be the deciding factor in this case.

In *Blue & Gold*, we created a "waiver rule" for claims filed at the United States Court of Federal Claims ("Claims Court") challenging a patent error in a solicitation for a government contract.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).  Although we called it a "waiver rule," this is a misnomer.  Waiver is an equitable defense, the application of which is left to the trial court's discretion.  *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed. Cir. 2008).  To prove waiver, the defendant must show that the plaintiff *intentionally* relinquished its right.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).   Given the draconian effect of waiver, "[t]he determination of whether there has been an intelligent waiver of right . . . must depend, in each case, upon the particular facts and circumstances surrounding that case." *Id.*  The *Blue & Gold* waiver rule does not fit this definition.  A court applying this rule gives no regard to the protestor's intent and is afforded no discretion in its application.  These are not the marks of true waiver.

Rather, the *Blue & Gold* "waiver rule," in theory and in practice, is a judicially-created time bar.  *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1316–17 (Fed. Cir. 2016) (Reyna J., concurring) (noting that under the *Blue & Gold* "timeliness bar" "[d]ismissal is mandatory, not

discretionary" (internal citations omitted)); s*ee also Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015); *Contract Servs., Inc. v. United States*, 104 Fed. Cl. 261, 273 (2012); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 137 (2009). The bar is triggered solely by the timing of a protestor's challenge. Specifically, if a protestor files a claim challenging a patent error in a solicitation *prior to the close* of the bidding process, the protestor's claim is deemed timely. *Blue & Gold*, 492 F.3d at 1313. If, however, the protestor files such a claim *after the close of bidding*, without having previously objected to such an error, the protestor's claim is untimely and will be dismissed. *Id.* at 1315; *Bannum*, 779 F.3d at 1380; *see* Maj. Op. at 8. There are no exceptions to this rule; its application is hard and fast. *See Per Aarsleff*, 829 F.3d at 1316.[1] The *Blue & Gold* "waiver rule" therefore poses as a rule of equitable waiver but is in fact a timeliness rule.

---

[1] In creating the "waiver rule," this court relied on various analogous timeliness doctrines. First, we noted that our rule virtually tracks the "timeliness regulation" for bid protests filed before the Government Accountability Office ("GAO"), a federal agency which adjudicates bid protests. *Blue & Gold*, 492 F.3d at 1314. The GAO's timeliness rule is a self-imposed filing deadline for bid protests, functioning much like a statute of limitations. *See* 4 C.F.R. § 21.2(a).

We also found support in *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992), a patent case where we relied on the equitable doctrines of laches and estoppel to bar relief, and in a long line of Claims Court cases applying the defense of laches. *Blue & Gold*, 492 F.3d at 1314–15. Notably, *SCA Hygiene* abrogated *Aukerman*. *See SCA Hygiene*, 137 S. Ct. at 967. Also, the Claims Court no longer applies laches to bar bid

4                    INSERSO CORP. v. UNITED STATES

In *SCA Hygiene*, the Supreme Court clarified that: "[w]hen Congress enacts a statute of limitations, *it speaks directly to the issue of timeliness* and provides a rule for determining whether a claim is timely enough to permit relief." *SCA Hygiene*, 137 S. Ct. at 960 (emphasis added). Specifically, the Supreme Court "stressed" that "courts are not at liberty to jettison Congress' judgment on the *timeliness of suit*," even if the statute of limitations gives rise to "undesirable" "policy outcomes." *Id.* at 960, 961 n.4 (internal quotation marks omitted) (emphasis added). Relying on this principle, the Supreme Court held that a court cannot rely on the doctrine of laches, an equitable doctrine primarily focused on the timelines of a claim, to preclude a claim for damages incurred within the Patent Act's statute of limitations. *Id.* at 967; *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("For laches, timeliness is the essential element."). Yet this is precisely what we are doing in this case.

The Supreme Court rejected the same concern we articulated as the driving force in *Blue & Gold*—that a plaintiff could sit on its rights to the detriment of the defendant—as justification for a timeliness rule distinct and separate from a statute of limitations. In *SCA Hygiene*, the dissent argued that laches filled a "gap" in the statute of limitations which allowed patentees to "wait until an infringing product has become successful before suing for infringement." *SCA Hygiene*, 137 S. Ct. at 961 n.4. The Supreme Court explained that such argument "implies that, insofar as the lack of a laches defense could produce policy outcomes judges deem undesirable, there is a 'gap' for laches to fill, notwithstanding the presence of a statute of limitations." *Id.* The Supreme Court explained such gap-filling is "precisely the kind of legislation-

---

protests in light of *SCA Hygiene. See, e.g.*, *ATSC Aviation, LLC v. United States*, 141 Fed. Cl. 670, 696 (2019).

overriding judicial role" a court cannot take on. *Id.* (internal quotation marks omitted). Yet, in the face of this admonition, this court once again assumes such a legislative role.

Key here, and not discussed in *Blue & Gold*, is that Congress has spoken to the timeliness of challenges to patent errors in the solicitation. Congress provided that "***[e]very claim*** of which the United States Court of Federal Claims has jurisdiction," which includes challenges to patent errors in the solicitation, "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (emphasis added); *see also* 28 U.S.C. § 1491(b)(1); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 460–61 (2007) (applying the six-year statute of limitations to bid protest claims). Congress also provided that the Claims Court has jurisdiction over solicitation challenges "*without regard to whether suit is instituted before or after the contract is awarded.*" 28 U.S.C. § 1491(b)(1) (emphasis added). Given this clear congressional directive, we cannot curtail the six-year limitations period for challenges to patently defective solicitations. *See SCA Hygiene*, 137 S. Ct. at 967. Thus, the *Blue & Gold* time bar directly conflicts with the reasoning in *SCA Hygiene*.

Additionally, our interest in reducing costly after-the-fact litigation and procurement delays does not save the *Blue & Gold* time bar from *SCA Hygiene*'s reach. We cannot override the Claims Court's six-year statute of limitations based on our own policy concerns. *Id.* ("[W]e cannot overrule Congress's judgment based on our own policy views."). To do so is to challenge policy judgments made by Congress in enacting the six-year statute of limitations. *Petrella*, 572 U.S. at 686 (noting that it is "not within the Judiciary's ken to debate the wisdom" of the applicable statute of limitations).

Instead, we consider the prejudicial effects of delay at the remedy phase. *Id.* at 685, 687 (noting that in "extraordinary circumstances, . . . the consequences of a delay in commencing suit may be sufficient to warrant . . . curtailment of the relief equitably awarded"). Here, the Claims Court has the discretion to "award *any relief* that the court considers proper," including declaratory relief, injunctive relief, and monetary relief limited to bid and proposal costs. 28 U.S.C. § 1491(b)(2) (emphasis added). Additionally, the Claims Court "shall give due regard to . . . the need for expeditious resolution of the action." *Id.*, § 1491(b)(3). Thus, the Claims Court is empowered to consider a protestor's prejudicial delay when fashioning relief. Additionally, it is in the public interest that government-made errors in a solicitation do not go unreviewed, even if the only feasible remedy given a protestor's delay is a declaratory judgment that the government erred. *See Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 429 (2018) (noting that an "important public interest" is served through "honest, open, and fair competition" because such competition "improves the overall value delivered to the government in the long term" (internal quotation marks omitted)).

The majority recognizes that Congress imposed a six-year statute of limitations on bid protests before the Claims Court. The majority contends, however, that the *Blue & Gold* time bar is statutorily authorized because Congress instructed the Claims Court to give "due regard to the . . . need for expeditious resolution of the action." Maj. Op. at 9 (quoting 28 U.S.C. § 1491(b)(3)). The majority misreads Section 1491(b)(3).

First, a general and broad "need for expeditious resolution" of all bid protest claims does not translate into a discrete statute of limitations for a subset of bid protest claims, namely solicitation challenges. *See Blue & Gold* 492 F.3d at 1315 (noting that "it is true that the jurisdictional grant of 28 U.S.C. § 1491(b) contains no time

limit requiring a solicitation to be challenged before the close of bidding"). Specifically, per its plain language, Section 1491(b)(3) requires the Claims Court to give "due regard" to expeditious resolution of an action, not license to override the Claims Court's six-year statute of limitations.

Additionally, Section 1491(b)(3) must be read in context with the preceding provision, Section 1491(b)(2), which gives the Claims Court discretion in affording "any relief that the court considers proper." 28 U.S.C. § 1491(b)(2); *see, e.g.*, *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (noting that "statutory language *must always* be read in its proper context" and not in isolation (emphasis added)). When both provisions are read in harmony, the "due regard" provision refers to the Claims Court's need to consider expeditious resolution of bid protests when deciding the proper relief. Specifically, the Claims Court should consider whether to order the government to restart the procurement process underlying the bid protest or to award relief which would not extend the procurement process, such as bid and proposal costs or declaratory relief.

Lastly, the majority's reading of Section 1491(b)(3) runs afoul of the Supreme Court's reasoning in *SCA Hygiene.* As the Supreme Court explained, once Congress enacts a statute of limitations, the statute governs the timeliness of claims even in the face of other statutory provisions. *SCA Hygiene*, 137 S. Ct. at 963. In *SCA Hygiene*, the respondent argued that the Patent Act codified a laches defense, and, thus, laches could apply even in the face of a statute of limitations. *Id.* The Supreme Court explained that even assuming that the statute provided for laches "of some dimension," it did not follow that such a statutory defense could be invoked to bar a claim filed within the statute of limitations. *Id.* The Supreme Court explained that "it would be exceedingly unusual, if not unprecedented," for Congress to include both a statute of limitations and a laches provision. *Id.* The Supreme Court further explained that it was not

8                                    INSERSO CORP. v. UNITED STATES

aware of "a single federal statute that provides such dual protection against untimely claims." *Id.* As in *SCA Hygiene*, it would be unusual for Congress to provide dual protection against untimely solicitation-related claims via the broad discretionary language in Section 1491(b)(3) and the Claims Court's clear six-year statute of limitations. If no federal statute provides such dual protection, it would be unreasonable to impose a court-made timeliness bar to overcome a statute of limitations imposed by Congress.

For the above reasons, *Blue & Gold* conflicts with the reasoning in *SCA Hygiene*, and, thus, should not decide the outcome of this case.

II

Second, the majority improperly shoehorns Inserso's claims into the narrow and now undermined *Blue & Gold* domain. The *Blue & Gold* time bar applies only to challenges of *patent errors* in a solicitation. Inserso's claims, which do not challenge any patent errors in the solicitation, are not subject to this rule.

The *Blue & Gold* time bar applies only to challenges against *patent errors* in the solicitation. *Blue & Gold*, 492 F.3d at 1313. "Latent errors or ambiguities are not, of course, subject" to the *Blue & Gold* time bar. *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 n.5 (Fed. Cir. 2012). An error is "patent" if it is "an obvious omission, inconsistency or discrepancy of significance." *Per Aarsleff*, 829 F.3d at 1312 (internal quotation marks omitted). By contrast, "[a] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Id.*

Here, Inserso brought two claims before the Claims Court: an organizational conflict of interest ("OCI") claim and, in the alternative, a claim alleging that the

government unequally treated offerors.    Both of these claims arise from the government's disclosure of allegedly competitive pricing information to only the bidders in the Full & Open suite—one of two suites at issue.[2]   This unequal disclosure occurred only as a result of a divergence in the timing of the competitions of both suites.    This timing discrepancy between the two suite competitions developed well after the release of the solicitations.

There is no obvious error, inconsistency, or discrepancy from the face of the solicitation indicating that the government would unequally disclose competitive pricing information.    To the contrary, the solicitation informed bidders that the government (a) recognized that pricing information from one suite could be competitively valuable in the other suite, and (b) would take necessary measures to prevent unequal disclosure of such information.    For example, the solicitation provided that the government would not release its estimated labor hours, a key pricing data point, until the competition for both suite competitions concluded.  J.A. 101918.  The solicitation also provided that the government would identify any potential

---

[2] The competition at issue was divided into two "suites":  one in which businesses of any size could compete (the "Full & Open" suite), and one in which businesses which qualify as "small business concerns" could compete (the "Small Business" suite).    J.A. 101891.    Large businesses could compete in the Small Business suite as part of a joint venture with a small business.    The solicitation also noted that Full & Open and Small Business suite competitions would begin simultaneously. As it played out, the agency completed the Full & Open suite competition months before the Small Business suite competition.  Inserso competed in the Small Business suite competition.

OCIs. J.A. 101815 ("If any [conflicts of interests] become known to the Government, as defined by FAR Part 9.5, *they will be identified.*" (emphasis added)).

To hold otherwise places an undue and unjustified burden on contractors to actively investigate, anticipate, and preemptively challenge all conflicts of interest that could potentially arise under a solicitation. Inserso is not the government's keeper. *See NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 523 n.17 (2011) ("No doctrine or case requires a potential protestor to be clairvoyant or to police an agency's general noncompliance with the FAR on the possibility that such misfeasance might become relevant in a protest."). Additionally, for small business contractors, like Inserso, such a burden could disincentivize entry to the federal procurement market. Rather, it is the government's burden to thoroughly investigate OCIs. For all federal government procurements, "contracting officers shall analyze planned acquisitions in order to . . . [i]dentify and evaluate potential organizational conflicts of interests as early in the acquisition process as possible; and . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a); *id.*, § 9.504(e).[3]

The majority argues that Inserso should have known that the government would disclose competitive pricing

---

[3] Courts should exercise caution in applying the *Blue & Gold* time bar to OCI claims, if at all. An OCI is a significant error that undermines the integrity of the procurement process. *See NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 380 (Fed. Cir. 1986) (explaining that an "unfair competitive advantage . . . damages the integrity of the proposal system"). Given this gravity, and in light of *SCA Hygiene*, a court should review the merits of an OCI claim rather than bar such claim due to timeliness concerns.

information, specifically, details regarding its price evaluation methodology, to Full & Open competitors during the debriefing process.[4] Maj. Op. at 11. Thus, the majority reasons, Inserso should have challenged such disclosure from the outset of the competition. *See id.* The majority misunderstands the nature of agency debriefings. Apart from certain baseline required disclosures not at issue here, a government agency has discretion as to what it will disclose in a debriefing. *See* 48 C.F.R. § 15.506(d). Agencies can fail to provide any meaningful information to bidders. *See* Anna Sturgis, *The Illusory Debriefing*: *A Need for Reform*, 38 Pub. Cont. L.J. 469, 470, 2009. Thus, Inserso could not have reasonably known that the government would release detailed price evaluation methodology information in the Full & Open suite debriefings. The majority reaches a contrary conclusion through the lens of 20/20 hindsight.

The majority also suggests, without any articulated principled rationale, that the *Blue & Gold* time bar can extend to non-solicitation challenges. The majority's sole support is a non-binding Claims Court case. *See* Maj. Op. at 8 (citing *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011)). We have never previously extended *Blue & Gold* beyond challenges to the solicitation. *See, e.g.*, *Bannum*, 779 F.3d at 1380; *Sys. Application &*

---

[4] Once a competition concludes, a bidder may request a debriefing. *See* 48 C.F.R. § 15.506(a)(1). A debriefing is an opportunity for the government to discuss certain aspects of the competition and its evaluation of the bidder's proposal. If requested, the government is required to debrief the bidder. *Id.* Generally, bidders request a debriefing as a matter of course. Here, the government completed the Full & Open suite competition before the Small Business suite competition. Thus, the government debriefed the Full & Open suite competitors before the Small Business suite competitors.

*Techs., Inc. v. United States*, 691 F.3d 1374, 1385 (Fed. Cir. 2012); *COMINT*, 700 F.3d at 1382; *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009). We should not do so today. Specifically, such an extension is contrary to the express reasoning in *Blue & Gold*. In *Blue & Gold*, we relied on a determination that the defect at issue pertained to the "decision during the solicitation, not evaluation, phase of the bidding process." 492 F.3d at 1313. We also noted that a time bar against post-award challenges stemmed from the Claims Court's jurisdiction to adjudicate claims "***objecting to a solicitation*** by a Federal agency." *Id.* (quoting 28 U.S.C. § 1491(b)(1)) (emphasis added). Therefore, *Blue & Gold* made clear that any bar applies strictly to solicitation challenges only.

## III

Lastly, the majority acts with improper haste when it bars *in the first instance* Inserso's claims pursuant to the undermined *Blue & Gold* time bar. As a general matter, a federal appellate court "does not consider an issue not passed upon below." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339 (Fed. Cir. 2010). There are, however, "circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (internal quotation marks and citations omitted). This is not such a case.

Here, the parties narrowly briefed the applicability of *Blue & Gold* below and on appeal. Specifically, neither party briefed *Blue & Gold* post-*SCA Hygiene* and instead primarily focused on the merits of Inserso's claims. Most notably, the Claims Court did not address whether Inserso's claims were time-barred under *Blue & Gold* but instead reached the merits of Inserso's claims. Thus, given this backdrop, we should not apply *Blue & Gold* in the first instance. *See Wood v. Milyard*, 566 U.S. 463, 473 (2012)

(noting that appellate "restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below, and therefore would not have anticipated in developing their arguments on appeal").  We should instead reach the merits of Inserso's claims.

I respectfully dissent.